UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
SHELDON LEFTENANT,

               Petitioner,         <u>MEMORANDUM AND ORDER</u>

    -v-                          20-cv-436 (JS)

ATTORNEY GENERAL OF THE STATE
OF NEW YORK (Clinton Correctional
Facility Superintendent),

               Respondent.
------------------------------------X
APPEARANCES


For Petitioner:    Sheldon Leftenant, <u>Pro Se</u>
                  16-A-1249
                  Attica Correctional Facility
                  P.O. Box 149
                  Attica, New York 14011

For Respondent:    Marion Tang, Esq.
                  District Attorney's Office of Suffolk County
                  200 Center Drive
                  Riverhead, New York 11901


SEYBERT, District Judge:

        Following a state court jury trial, Petitioner Sheldon Leftenant ("Petitioner" or "Leftenant"), was convicted of one count each of Attempted Aggravated Murder of a Police Officer (Count 1, PL §125.26[1][a][i] as modified by PL §110.00, a class A-I violent felony), Criminal Possession of a Weapon in the Second Degree (Count 2, PL §265.03[1][b], a class C violent felony), and Resisting Arrest (Count 3, PL §205.30, a class A misdemeanor)(hereafter, the "Conviction").  Before the Court is Petitioner's <u>pro se</u> petition for a writ of habeas corpus pursuant

to 28 U.S.C. § 2254 ("§ 2254") raising four grounds for relief. (Petition ("Pet."), ECF No. 1.)  Respondent Attorney General of the State of New York ("State" or "Respondent"), has responded to the Petition (see Return, ECF No. 8; see also Respondent's Memorandum of Law ("Resp. Opp."), ECF No. 8-1), to which Petitioner has replied (see Reply/Traverse ("Traverse"), ECF No. 15).  For the reasons set forth below, the Petition is DENIED in its entirety, and the case is dismissed.

BACKGROUND

I.   The Offensive Conduct[1]

Second Precinct Police Officers Mark Collins, Robert Dorr, and Damian Torres (collectively, the "Officers") were assigned to a special plainclothes task force in Huntington Station, focusing on a certain sector which experienced a high level of drug activity, gang violence, robberies, assaults, and

---

[1]  The summary of facts is drawn from: the Petition, the pretrial hearing transcript ("Pretrial Tr.") (see ECF No. 9-1); the trial transcript ("Tr.") (see ECF Nos. 9-2, 9-3); the sentencing transcript ("Sent'g Tr.") (see ECF No. 9-4); Petitioner's state court appellate brief ("App. Br.") (see ECF No. 9-5), which Petitioner incorporates by reference into his Petition in support of his claims (see Pet. ¶ 13); Respondent's state opposition brief ("State Opp. Br.") (see ECF No. 9-6); the Decision & Order of the Appellate Division Second Department ("App. Div. Decision")(see ECF No. 9-7); Petitioner's application for leave to appeal to the New York Court of Appeals ("C.A. Appl.")(see ECF No. 9-9); and Respondent's opposition to Petitioner's application for appeal ("C.A. Opp.")(see ECF No. 9-8).

burglaries.    (Tr. at 1327:15-20; 1328:2-12; 1334:2-7; 1335:24-
1338:15.)

On March 11, 2015, the Officers were patrolling in an unmarked
gray Ford Edge (the "Edge"). (Id. at 1338:3-19.)  At approximately
11:50 p.m., the Officers witnessed a dark-colored Honda sedan (the
"Honda") traveling eastbound on Jericho Turnpike near the Roadway
Inn at approximately 60 m.p.h. in a zone with a speed limit of 40
m.p.h. (Id. at 705:7-9; 708:20-709:3; 1338:20-1339:15.)    The
Officers initiated a traffic stop, beginning with following the
Honda for about a mile until it made a quick right onto Goeller
Avenue.  (Id. at 1339:19-1340:2-13, 603:3-604:14; 1340:3-1340:6.)
Officer Dorr then activated the police light-bar and placed it on
the dashboard; thereafter, the Honda abruptly stopped in the middle
of the road near the well-lit intersection of Goeller Avenue and
Jericho Turnpike. (Id.)  On the right was an open gas station and
on the left was a row of stores and a bar called the "Instant
Replay".  (Id. at 604:4-8; 1340:20-1341:8.)

The Officers exited their vehicle and approached the
Honda. (Id. at 604:23-605:4 1341:9-1342:14.)   Officer Torres
proceeded to the driver's side; Officer Dorr stopped at the rear
trunk; and Officer Collins walked to the passenger side. (Id. at
604:23-605:4 1341:9-1342:14.)  As the Officers approached, they
noticed the rear passengers turning around to look back at them
and moving about a great deal.  (Id. at 604:23-605:4; 658:22-

659:5; 1342:15-19.)  Officer Dorr saw the left rear passenger reach
down and go out of sight for a moment (id. at 605:5-10); he shone
his flashlight through the back window and recognized the rear
passengers as being Keith Primm ("Primm") seated on the left, and
Petitioner seated on the right.  (Id. at 605:17-22.)  Officer
Torres approached the driver's window, identified himself as a
Suffolk County Police Officer, and asked the driver for his
license, registration, and proof of insurance.  (Id. at 658:22-
659:16.)  Officer Torres identified the driver as Phillipe Victor
("Victor") and the front passenger as Jean Luc Garand ("Garand").
(Id. at 660:2-8; 722:19-21.)

As Officer Collins continued toward the vehicle, he saw
Petitioner put his hand in his pocket.  (Id. at 1342:20-1343:2.)
Officer Collins banged on the window with his hand and told
Petitioner to take his hand out of his pocket.  (Id. at 1342:20-
1343:22.)  Petitioner complied and slowly put his hand in his lap.
(Id. at 1343:16-25.)  Officer Collins then banged on the window
again, identified himself as a Suffolk County Police Officer and
asked for identification.  (Id. at 1344:2-6.)  Petitioner rolled
down the window and handed Officer Collins a "New York State new
style ID."  (Id. at 1344:7-25.)  Since Officer Collins had worked
in this section of Huntington for about eight years, he had come
to know Petitioner, being acquainted with Petitioner for
approximately seven years.  (Id. at 1335:2-11, 21-23.)  Recognizing

4

Petitioner, Officer Collins asked: "Sheldon, I haven't seen you in a while. Where have you been?"  Petitioner replied, "Officer, you know me, I been staying out of trouble. I'm staying in Mastic with my family." (Id. at 1345:7-22.)

During this short conversation, Officer Collins also noticed Primm was "very uneasy" and continued to move around, moving his hands under the seat, under his legs, and in and out of his pockets. (Id. at 1345:7-25.)  Officer Torres repeatedly told Primm to put his hands on his lap, but Primm continued to hide his hands, move his hands under his legs, in and out of his pockets, and under the seats.  (Id. at 661:2-12.)  Feeling unsafe, Officer Torres asked Primm to step out of the vehicle.  (Id. at 661:2-12.) Officers Torres and Dorr escorted Primm to the Honda's left rear and conducted a quick pat-down in search for weapons.  (Id. at 661:20-25.)

During Primm's pat-down, Petitioner "became visibly nervous" and started "looking around." (Id. at 1348:2-6.)  Although Petitioner's hands had been calmly in his lap, he began "frantically moving around [as] well," looking over his shoulder to see what was happening with Primm and looking back to Officer Collins.  (Id. at 1348:2-13.)  Officer Collins then asked Petitioner to step out of the vehicle and opened the rear passenger side door.  (Id. at 1348:22-1349:2.)  As soon as the car door was opened, Petitioner took off running.  (Id. at 609: 16-20; 662:2-

5

9; 1349:11-14.)  Officer Torres, who had proceeded around the back of the vehicle to assist Officer Collins, tried to grab Petitioner. (Id.  at 610:14-18; 662:16-22; 1349:13-1350:6.)  But Petitioner, who was wearing a gray jacket, spun around and ran northbound through the gas station in a northwest direction.  (Id.  at 610:14-18; 662:16-22; 1349:13-1350:6.)  Officer Collins gave chase, running only 10-to-15 feet behind, yelling "Stop.  Police."  (Id. at 663:306; 1349:13-1350:14; 1352:3-5.)  Officer Torres followed only about 30-feet behind.  (Id. at 664:12-15.)

Petitioner ran northbound towards Jericho Turnpike. (Id.  at 663:7-16; 1349:11-16.)  When Officer Collins reached Jericho Turnpike, he slowed down because it was a busy road.  (Id. at 1351:8-12.)  He pulled out his TASER from his police vest and continued to follow Petitioner across Jericho Turnpike and towards Mercer Court.  (Id.  at 663:23-664:11; 1350:21-1351:22.)  Officer Torres followed in tow.  (Id. at 664:12-15.)  Petitioner continued running, but changed directions, heading westbound; he crossed over Mercer Court and Officer Collins began gaining on him.  (Id. at 664:19-23; 681:3-14; 1351:16-1352:11, 1353:10-13.)  Petitioner then headed into a residential driveway, which was poorly lit. (Id. at 153:22-1354:2, 1355:3-9.)

Officer Collins tried pointing the TASER's red light in front of Petitioner to alert Petitioner that he was behind him with a taser and to deter Petitioner and gain his compliance.  (Id.

at 1354:6-20.)   Officer Collins also yelled, "Stop. Police. I'm going to tase you." (Id. at 1354:6-20.)   However, Petitioner kept running up the driveway with Officer Collins in pursuit.   At the top of the driveway was a PVC fence with a gate; like a football player, Petitioner tucked his shoulder and ran right into the gate trying to break through it.   (Id. at 1355:3-13.)   Instead, Petitioner bounced back off the gate.   (Id. at 1355:14-16.) Thereafter, Officer Collins ordered Petitioner down on the ground or he would be tased.   (Id. at 1355:17-19.)   Petitioner started turning towards Officer Collins, who could not see Petitioner's hands; in response, Officer Collins deployed his TASER.   (Id. at 1355:20-25.)   However, because the TASER did not deploy properly, Petitioner did not fall to the ground in a "muscular lockup" as would be expected.   (Id. at 1356:5-14.)   Instead, Petitioner continued turning "[p]retty quick" towards Officer Collins who grabbed Petitioner by the shoulders and threw him into a pile of snow.   (Id. at 1356:23-1357:6; 1417:21-24.)   Officer Collins told Petitioner to put his hands behind his back and stop resisting. (Id. at 1391:13-16.)   As the two men fell to the ground, the defective TASER shocked Officer Collins, though not strongly enough to disable him, and Officer Collins tossed it away to avoid further shocks.   (Id. at 1357:9-25; 1391:19-24.)

Attempting to handcuff him, Officer Collins got on top of Petitioner.   (Id. at 1391:17-18.)   He started pulling on

7

Petitioner's hands trying to get them out but "they were very firm" and he "could feel they were moving around like he was trying to grab for something." (Id. at 1358:14-18.) Officer Colins began "to punch [Petitioner] a few times in the face trying to soften him up to get his hands out," but that did not work. (Id. at 1358:19-23.) Petitioner was laying on his side with Officer Collins directly over him when Officer Collins "saw a couple of [blue] sparks very close to [his] face," "followed by four loud pops." (Id. at 1358:24-1359:13.) According to Officer Collins, time seemed to have "stood still." (Id. at 1359:14-16.) He realized Petitioner had a gun and was shooting at him. (Id. at 1359:14-16.)

        Officer Collins tried to draw his service weapon from his right-side holster but discovered his right arm would not move. (Id. at 1359:17-24; 1360:9-19.) He then tried to reach across his waist and pull out his service weapon with his left hand but was unable to pull it out. (Id. at 1360:3-8.) Still on top of Petitioner, he realized it was likely best for him to get some kind of cover and create distance between he and Petitioner. (Id. at 1361:17-20.) When he tried to stand up, Officer Collins discovered that his right leg did not work either. (Id. at 1361:21-25.) Instead, Officer Collins pulled himself on his belly to a set of concrete steps he saw when he first ran up the driveway. (Id. at 1362:9-17.) He was hoping to get behind the steps for

protection.  (Id. at 1362:9-17.)  In that moment, Officer Collins believed that Petitioner was going to shoot him in the "back of the head . . . to finish [him] off."  (Id. at 1362:18-1363:4.) Officer Collins finally reached the steps and pulled his police vest over his face as a shield and watched Petitioner undo the latch, open the gate into the rear yard, and head right.  (Id. at 1362:18-1363:4.)

Soon after, Officer Torres arrived at the top of the driveway and discovered Officer Collins on his back.  (Id. at 666:2-10.)  Officer Torres kneeled next to Officer Collins who said, "Damian, I'm shot. He Shot me."  (Id. at 666:2-10.)  Seeing a gunshot wound on Officer Collins' neck, Officer Torres radioed for help.  (Id. at 666:2-667:8.)

Officer Dorr had remained behind at the traffic stop while Officers Collins and Torres pursued Petitioner.  (Id. at 610:9-611:8.)  After what "[f]elt like. . . an approximate 10, 15 seconds," Officer Dorr heard four gunshots.  (Id. at 611:19-21; 612:8-13.)  He instructed Primm to put his hands on the Honda and for the other passengers to show their hands, which they did.  (Id. at 612: 14-20.)  Officer Dorr then heard an undiscernible "garbled" transition come over the radio.  (Id. at 612:22-613:11.) Suspecting Officers Collins or Torres may have been shot, Officer Dorr decided to go after them.  (Id. at 613:5-16.)  He jumped in the Edge and proceeded down Jericho Turnpike trying to find the

9

other Officers.  (Id. at 613:12-614:2.)  As Officer Dorr continued westbound on Jericho Turnpike, he saw Officer Torres shining a flashlight and Officer Collins on his back in a snowbank, bleeding from a gunshot wound to his neck.  (Id. at 614:10-615: 10.)  Having exited the Edge, Officer Dorr knelt down next to Officer Collins and heard him say that Petitioner shot him.  (Id. at 615:23-616:25.)  Officer Torres also recalled Officer Collins saying, in a horse voice, "Damian, Sheldon Leftenant shot me. His ID is in my pocket."  (Id. at 667:9-20.)  Officer Torres reached into Officer Collins' pocket and pulled out a New York State driver's license belonging to Petitioner.  (Id. at 667:9-20.)  Officers Dorr and Torres treated Officer Collins who was having difficulty breathing, "freezing cold" and "shaking uncontrollably."  (Id. at 616: 2-25; 667:9-20; 1367:5-1368:25.)  Ambulance personnel arrived and placed Officer Collins in an ambulance; he was subsequently taken by helicopter to Stony Brook University Hospital where he was treated for gunshot wounds to his neck and right flank.[2]  (Id. at 617:15-20; 668:15-17; 1369:2-25, 1308:9-20; 1370:6-1371:2; 1372:7-22.)  Officer Collins survived his injuries but required subsequent vocal cord surgery, treatments, and therapy.  (Id. at 1377:7-24.)

---

[2] "Flank" is an anatomically defined area which is lateral to the anterior abdomen.  (Id. at 1313:21-25.)  It is "primarily the musculature on the side of [the] abdomen."  (Id. at 1313: 21-1314:6.)

A. <u>The Search for Petitioner</u>

After Officer Collins was placed in the ambulance, a full description of Petitioner was broadcast over the radio. (<u>Id.</u> at 668:18-24.)

John Bryne ("Byrne"), a civilian who lived in a second-floor apartment at 19 Mercer Court, had heard gunshots just before midnight on March 11, 2015. (<u>Id.</u> at 744:21-745:20.) He looked out his window and saw a black male, with black curly hair, wearing a gray jacket, jeans, and dark shoes, coming around the corner of the side fence of his neighbor's house. (<u>Id.</u> at 746:12-748:2.) The man ran around the fence, grabbed the bolt, and swung himself around. (<u>Id.</u> at 747:2-15.) Byrne then watched him run up along the side of the house and fall in the snow. (<u>Id.</u> at 747:2-15.) Byrne then screamed out the window, "[O]fficer, somebody is running over here thorough my neighbor's house." (<u>Id.</u> at 747:2-15.) The man looked right up at Byrne. (<u>Id.</u> at 754:2-18.) Byrne then headed to his back deck and saw the man jump the fence into the yard of another neighbor. (<u>Id.</u> at 748:15-749:24.) thereafter, Byrne went outside and saw an officer coming down the block. (<u>Id.</u> at 756:8-16.) Byrne told the officer he saw someone run through his yard and jump the fence. Soon after, he saw "K-9 cops coming." (<u>Id.</u> at 756:8-16.)

K-9 Unit officers were called to respond to 11 Mercer Court to locate a suspect who shot an officer. (<u>Id.</u> at

768:4-769:4.)  Officer  Kenneth  O'Brien  and  his  dog,  Dodge,
responded  to  the  call  and  began  working  the  area  trying  to  find
human  scent.  (Id.  at  768:4-769:24.)  Right  on  the  property  line
of  13  and  15  Mercer  Court,  Dodge  began  tracking;  thereafter,  he
and  Officer  O'Brien  followed  the  scent.  (Id.  at  771:6-777:22.)
Officer  Brendan  Gayer  and  his  dog,  Rascal,  joined  the  search.  (Id.
at  777:12-22;  788:21-24;  794:15-795:21;  797:7-19.)  Officer  Gayer
and  Rascal  went  through  a  gate  on  the  east  side  of  94  East  25th
Street,  just  north  of  11  Mercer  Court,  where  Rascal  alerted  to  a
metal  shed.  (Id.  at  669:10-17;  798:16-801:4.)  Based  on  Rascal's
alert,  Officer  Gayer  was  "very  convinced  that  there  was  a  human
inside  of  that  shed."  (Id.  at  801:5-8.)  Officer  Gayer  requested
assistance  from  other  officers.  (Id.  at  801:9-24.)  The  responding
officers  were  able  to  open  the  shed  by  tearing  the  shed  door  from
its  hinges.  (Id.  at  804:21-805:10.)  Inside  the  shed,  Officer
Gayer  saw  Petitioner  "seated  upright  but  [in  the]  fetal  position."
(Id.  at  805:12-806:7.)  Despite  commands  to  come  out  with  his  hands
up,  Petitioner  did  not  voluntarily  come  out  of  the  shed.  (Id.  at
805:18-806:25.)  Petitioner  was  forcibly  removed  by  officers  and,
although  he  resisted,  was  eventually  handcuffed.  (Id.  at  806:11-
25.)

     Officer  Torres  confirmed  and  identified  the  man  that  was
pulled  from  the  shed  as  Petitioner,  the  same  subject  that  was  in

the vehicle stopped on Goeller Avenue and the same subject that was running from he and Officer Collins.  (Id. at 669:18-670:5.)

After receiving medical attention, Petitioner was taken to the Third Precinct to be processed.  (Id. at 1065:20-1066:18.)  He was charged under Indictment No. 624-2015 with Attempted Aggravated Murder of a Police Officer, Criminal Possession of a Weapon in the Second Degree, and Resisting Arrest.

     B.   <u>The Recovered Evidence</u>

Just after midnight on March 12, 2015, Detective Michael Milau responded to 11 Mercer Court; he was instructed to go to the hospital where Officer Collins was being treated.  (Id. at 10485-23.)  There, Detective Milau recovered several items that had been removed from Officer Collins, including a: (1) bulletproof front vest panel; (2) pair of jeans; (3) pair of black Nike sneakers; (4) sock; (5) pair of boxer shorts; (6) blue shirt;(7) t-shirt; (8) sweatshirt; (9) shirt; and (10) a blanket Officer Collins had been wrapped in. (Id. at 1049:24-1050:10.)

Further, K-9 Officer Stephen J. McSweeney responded to 11 Mercer Court with his dog, McClane, to search for and recover evidence. (Id. at 867:10-868:7.)  Officer McSweeney and McClane performed an off-lead search specifically for explosive scents at 11 Mercer Court and 13 Mercer Court. (Id. at 869:15-870:11.) With the help of McClane, Officer McSweeney recovered a black durag in the backyard of 13 Mercer Court.  (Id. at 870:14-20.)  McClane

then led Officer McSweeney to a propane gas tank with a "hood that was over the top of it." (Id. at 870:14-872:4.)  Officer McSweeney "picked up the hood a little bit, saw the butt end of a revolver, [a] small revolver, put it back down" and rewarded McClane.  (Id. at 872:2-4.)  Officer McSweeney then went back to 11 Mercer Court and found Officer Collins' TASER, radio, and vest.  (Id. at 872:21-25; 880:3-24.)

In total, 16 items were recovered from 11 Mercer Court and collected by the Suffolk County Crime Laboratory's Crime Scene Response Team.  (Id. at 896:22-897:5; 830:22-831:4.)  The items included: (1) Officer Collins' "GLOCK 23 Gen4 pistol; (2) a hat recovered from Goeller Avenue; (3) a phone charger found at the entrance to the gas station; (4)-(5) Officer Collins' police vest, clothing, belt, shoes, and blanket used to cover him--received from Detective Milau; (6)-(9) AFIDs[3] discharged from Officer Collins' TASER; (10) TASER and attached wires; (11) a piece from Officer Collins' TASER cartridge; (12) a question stain in the snow that could have been blood; (13) a portion of police vest;

---

[3]  The Court understands the acronym "AFID" to mean "Anti-Felon Identification Disks", part of a serialized identification mechanism placed in cartridges which contain the projectile darts expelled from tasers.  (See Tr. 948-51); see also, e.g., D.A. Lounsbury & L. Frank Thompson, Locating Taser Anti-Felon Identification Disks, 57 J. FORENSIC IDENTIFICATION 223, 223-229 (2007), available at https://www.ojp.gov/ncjrs/virtual-library/abstracts/locating-taser-anti-felon-identification-disks#:~:text=This%20article%20demonstrates%20a%20method,using%20an%20alternate%20light%20source.

and (14) Officer Collins' radio; and (15)-(16) expended projectiles (bullets). (Id. at 933:2-4; 937:2-6; 940:23-8; 842:10-19; 947:17-948:12; 957:24-958:18; 959:21-24; 960:19-961:12; 961:13-14; 962:21-23; 973:22-8; 978:12-15.) A wallet was also recovered from a sidewalk near the lot located at 233 East Jericho Turnpike that Petitioner crossed, which included, inter alia, Petitioner's social security card, library card, and a N.Y.S. benefit identification card belonging to a Deon Leftenant. (Id. at 982:25-986:13.)

The .38 caliber revolver (the "Revolver") found on the propane tank and its casings were recovered, placed in a sealed package, and transferred to the Suffolk County crime lab for testing. (Id. at 988:2-990:19; 1053:2-1054:4.) The Revolver and casings were tested, after which it was determined the bullets found at the scene were fired from the Revolver and were used to shoot Officer Collins from only "zero to two inches" away. (Id. at 1179:9-13; 1184:14-23, 1218:14-1220:6; 1222:18-1246:15; 1249:10-22.) However, Officer Collins' service weapon was never used. (Id. at 1254:11-17.)

II. The Suppression Hearing

On October 26, 2015, a combined Huntley/Wade[4] hearing was held before Honorable John J. Collins of the Supreme Court,

---

[4] See United States v. Wade, 388 U.S. 218 (1967), and People v. Huntley, 15 N.Y.2d 72 (1965).

15

County of Suffolk.    (Pretrial Tr. at 1-2:24.)    Through his
appointed attorney, Ian Fitzgerald, Esq., Petitioner challenged
the admissibility of Petitioner's show-up identification and
certain post-arrest statements Petitioner made to police.  (Id. at
2:22-3:11.)[5]  At the beginning of the hearing, Petitioner requested
Mr. Fitzgerald be relieved as his attorney and he be appointed new
counsel. (Id. at 6:3-24; 7:17-23.)  Petitioner asserted his belief
that Mr. Fitzgerald was not working in his best interest.  (Id. at
7:17-23.)   He claimed Mr. Fitzgerald "pushes [him] off like he
doesn't care or doesn't have any interest in what [he is] talking
about." (Id. at 7:17-23.)  When the court asked Petitioner if he
intended to hire his own attorney, Petitioner responded he was
"looking for a lawyer." (Id. at 7:24-8:4.)

        The trial court noted Mr. Fitzgerald had been appointed
and representing Petitioner for at least seven months.  (Id. at
8:5-22.)   In all that time, the trial court had not received any
request from Petitioner for new counsel, and Petitioner had not
previously raised his dissatisfaction with Mr. Fitzgerald's
representation. (Id. at 8:5-9:10.)  Petitioner stated that, on or
about August 25, 2015, he had filed an "18-B" request form seeking

---

[5] Mr. Fitzgerald had also previously made a challenge to the grand
jury proceeding.  (Id. at 6:3-13.)  The Court found the grand jury
proceeding was proper and the three charges in the Indictment were
sufficiently sustained by the evidence.  (Id.)

to "fire" Mr. Fitzgerald.  (Id. at 9:23-11:10.)  The trial court advised Petitioner it never received such a form; moreover, at a September 14, 2015 court appearance, which was after Petitioner purportedly sent the form and prior to the initial Huntley/Wade hearing, Petitioner never brought his dissatisfaction with Mr. Fitzgerald's representation to the trial court's attention.  (Id. at 10:11-17.)  Despite warning Petitioner that his choice to raise his dissatisfaction with counsel just before witnesses were to be called at the Huntley/Wade hearing was "very, very late and potentially dilatory," the Court afforded Petitioner the opportunity to describe his concerns about Mr. Fitzgerald's representation. (Id. at 8:23-9:22.)[6]  Petitioner reiterated his belief that Mr. Fitzgerald: dismissed him as irrelevant; pushes him away "like a fly" when he asks for motions to be made; and was not helping Petitioner "in the way [he] want[ed] him to help." (Id. at 12:3-13:14.)  Petitioner stated he had asked Mr. Fitzgerald to make a motion for a change of venue but Mr. Fitzgerald just "pushed [him] off."  (Id. at 12:12-20.)

Thereafter, the trial court observed "Mr. Fitzgerald is a very experienced, criminal practitioner" who had done "everything legal[ly] and humanly possible to represent"

---

[6]  Petitioner was cautioned that anything said to the trial court during his application could possibly be used against him because the application was being made in open court. (Id. at 6:25-7:7.)

Petitioner.   (Id. at 9:11-21.)   The trial court detailed Mr.
Fitzgerald having done significant work in: procuring discovery
from the government; challenging statements Petitioner made to the
police at the time of his arrest; challenging the identification
of Petitioner; challenging the presentation to the grand jury; and
preparing himself diligently for the Huntley/Wade hearing. (Id. at
8:5-22.)  The trial judge further explained Mr. Fitzgerald was not
wrong in not making a change of venue motion since "this would not
be the appropriate time for a change of venue motion," which "[i]f
one were to be appropriate, it would not be until there was an
attempt at selecting a fair and impartial jury." (Id. at 12:21-
13:8.)   In light of Mr. Fitzgerald's representation through
Petitioner's oral application, the trial court found Petitioner
had not provided any reason Mr. Fitzgerald should be removed. (Id.
at 13:15-14:15.)   In fact, Mr. Fitzgerald had "gotten the DA's
office to consent to have these pretrial hearings."   (Id.)
According to the trial court, Petitioner was entitled to competent
counsel and "Mr. Fitzgerald more than [fit] that bill by quite a
lot."   (Id. at 15:23-16:2.)   Thus, since the case was in the
pretrial hearing stage and trial was not scheduled to begin until
"at least January," the court trial found Petitioner had ample
time to either make a formal motion to have counsel relieved, or
to hire his own attorney. (Id. at 15:23-17:2.)   Ultimately, the
trial court found Petitioner had not provided any basis why Mr.

18

Fitzgerald should be removed; therefore, it denied Petitioner's application and commenced the hearing.  (Id. at 17:6-22.)

III. The Trial

In January 2016, Petitioner appeared with Mr. Fitzgerald for his jury trial.  (See Tr. at 1-2:22.)  The first issue addressed was Mr. Fitzgerald's motion to preclude as unduly prejudicial "testimony regarding any alleged gang affiliation of [Petitioner]" or that "these police officers were in the . . . Gang Unit."  (Id. at 3:24-4:16.)  The People agreed to have the Officers refrain from referring to the "Gang Unit."  (Id. at 4:20-5:2.)  Mr. Fitzgerald also moved to subpoena Officer Collins' personnel file. (Id. at 6:8-7:6.)

Petitioner then addressed the trial court, again stating his belief Mr. Fitzgerald did not "have his best interest in mind." (Id. at 18:25-19:6.)  The judge again explained that, from the trial court's perspective, Mr. Fitzgerald had "done an excellent job" representing Petitioner, staying on top of all issues, and making all appropriate applications. (Id. at 19:9-20:16.)  It stated Mr. Fitzgerald had represented Petitioner well in court and in chambers, and had been successful on motions made on Petitioner's benefit. (Id.)  Thus, the Court proceeded with trial. (Id. at 20:17-22.)

After jury selection, but before opening statements, Mr. Fitzgerald moved to suppress certain video surveillance[7] provided by the People after jury selection. (Id. at 545:25-548:20.) The Court ruled Petitioner was prejudiced by the delayed production of the video and precluded its introduction at trial. (Id. at 815:13-818:9.)

On January 16, 2016, the jury reached a verdict. (Id. at 1566:13-15.) Petitioner was found guilty of all three counts of his Indictment. (Id. at 1566:24-16.) On March 28, 2016, Petitioner was sentenced to consecutive sentences totaling 56-years-to-life imprisonment and five-years' post-release supervision. (Sent'g Tr. 23:12-24:6;26:8-14.)

IV.  The Post-Conviction Proceedings

On May 1, 2018, through appellate counsel, Felice B. Milani, Esq., of Legal Aid Society of Suffolk County, Petitioner filed a direct appeal to the Appellate Division, Second Department on May 1, 2018. (See App. Br.) Petitioner's counseled brief raised four claims: (1) Petitioner was deprived of his constitutional right to effective assistance of counsel because his trial counsel, Mr. Fitzgerald, failed to seek suppression of "all actions" stemming from the purported unlawful seizure of Petitioner and failed to call a detective as a witness or move for a missing

---

[7]  The video was from the gas station located at the Jericho Turnpike/Goeller Avenue intersection.

witness charge (id. at 17-32); (2) the trial court erred when it failed to relieve Petitioner's counsel at his request (id. at 33-44); (3) Petitioner's Conviction was against the weight of the evidence and should be dismissed in the interest of justice (id. 45-48); and (4) Petitioner's cumulative sentence of 56-years was unduly harsh and excessive and should be modified in the interest of justice (id. at 49-52). Respondent opposed Petitioner's appeal. (See State Opp. Br.)

On June 26, 2019, the Appellate Division modified Petitioner's judgment of conviction only as to his sentence. (See App. Div. Decision at 1.) The Appellate Division determined the sentence imposed on the Conviction of Criminal Possession of Weapon was to run concurrently with the sentence imposed on the conviction of Attempted Aggravated Murder of a Police Officer. Id. Judgment of Conviction was otherwise affirmed. (Id.)

As to Petitioner's first claim, i.e., he was deprived effective assistance of counsel, the Appellate Division held, "defendant's contention. . . is without merit." (Id. at 2.) Upon review of the record, the Appellate Division found Mr. Fitzgerald provided "meaningful representation" to Petitioner. (Id.) Regarding Petitioner's claim Mr. Fitzgerald purportedly failed to file a suppression motion, the Appellate Division found there was no support for such a motion. (Id.) As it related to Petitioner's contention Mr. Fitzgerald was ineffective for failing to call a

certain detective as a witness, the Appellate Division held there was no compelling reason to call such detective as a witness, since the detective's testimony would not have been material; therefore, Mr. Fitzgerald was not ineffective and his decision could be explained "as a legitimate strategic choice." (Id.)

As to Petitioner's second claim, the Appellate Division held the trial court did not improvidently exercise its discretion in denying Petitioner's request for substitution of counsel because he "failed to make specific factual allegations of serious complaints about his assigned trial counsel" and following the appropriate inquiry, the trial court properly determined the request was not supported by good cause. (Id.)

The Appellate Division further found Petitioner's third claim, i.e., the evidence was legally insufficient to establish his guilt, was not preserved for appellate review. (Id. at 1.) Nonetheless, the Appellate Division found the contention to be without merit and the evidence was legally sufficient to establish guilt beyond a reasonable doubt. (Id.)

As to Petitioner's fourth claim concerning the issue of Petitioner's sentence, the People conceded, and the Appellate Division agreed, that Petitioner's sentence be modified resulting in his terms of imprisonment for his convictions of criminal possession of a weapon and attempted aggravated murder of a police officer running concurrently. (Id. at 2.)

On August 20, 2019, Petitioner's application for leave to appeal was summarily denied.  See People v. Leftenant, 34 N.Y.3d 934, 133 N.E.3d 407 (2019).  This Petition followed.

<u>Legal Standards</u>

I.   <u>Section 2254 Standard of Review</u>

"It is well established that a federal habeas court does not sit to correct a misapplication of state law, unless such misapplication violates the Constitution, laws, or treaties of the United States." Ponnapula v. Spitzer, 297 F.3d 172, 182 (2d Cir. 2002).  Pursuant to 28 U.S.C. §2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas court considering a claim that was decided on the merits in a state court proceeding may grant relief only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or" (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §2254(d).

The AEDPA establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. 362, 411 (2000); see

also McBride v. Perez, No. 13-CV-4792, 2015 WL 5245072, at *8 (S.D.N.Y. June 25, 2015) ("'[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States.'" (quoting Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)).  The requirements set forth by the AEDPA are strictly construed and, by design, erect a barrier to federal habeas relief founded upon the principle that "[s]tate courts are adequate forums for the vindication of federal rights" and are "presumptively competent[] to adjudicate claims arising under the laws of the United States." Burt v. Titlow, 571 U.S. 12, 19 (2013) (internal quotation marks and citation omitted).

Under § 2254(d)(1), a state court decision is considered "contrary to" federal law if it either "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." Williams, 529 U.S. at 405-06.  "'Clearly established Federal law' means 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" Green v. Travis, 414 F.3d 288, 296 (2d Cir. 2005) (quoting Williams, 529 U.S. at 412) (alteration in original).

An "unreasonable application" of federal law occurs where the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Williams, 529 U.S. at 407-08. "The critical point is that relief is available under § 2254(d)(1)'s unreasonable application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question." White v. Woodall, 572 U.S. 415, 427 (2014) (internal quotation marks and citations omitted).

Regarding the second subsection of §2254(d), courts have had "fewer opportunities to consider what constitutes an 'unreasonable determination of the facts'" pursuant to § 2254(d)(2), compared with § 2254(d)(1). Cardoza v. Rock, 731 F.3d 169, 177 n.5 (2d Cir. 2013). The state court's determination of the facts "is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010). A finding may rise to the level of an unreasonable determination of the facts "where, for example, reasonable minds could not disagree that the trial court misapprehended or misstated material aspects of the record in making its finding or where the court ignored highly probative and material evidence." Cardoza, 731 F.3d at 177-78 (first citing Wiggins v. Smith, 539 U.S. 510, 528 (2003); then citing Miller-El v. Cockrell, 537 U.S. 322, 346 (2003)). However,

25

"even if the standard set forth in section 2254(d)(2) is met, the petitioner still 'bears the ultimate burden of proving by a preponderance of the evidence that his constitutional rights have been violated.'" Id. at 178 (quoting Epps v. Poole, 687 F.3d 46, 50 (2d Cir. 2012)); cf. Nowakowski v. New York, No. 13-CV-3709, 2018 WL 6421056, at *6 (E.D.N.Y. Dec. 6, 2018) ("[F]or claims of 'unreasonable determination[s] of the facts' under paragraph (d)(2), an applicant bears the additional burden of 'rebutting the state court's factual findings 'by clear and convincing evidence.'" (quoting Burt, 571 U.S. at 20) (alteration in original)).

II.  Procedural Bars to Federal Habeas Review

    A.  Failure to Exhaust

        A habeas petition will not be reviewed by the district court unless "the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A). Exhaustion of state remedies requires a petitioner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365 (1995) (internal quotation marks and citation omitted; alteration in original).  The state courts must have had "the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding" for there to have been exhaustion of state

remedies, and therefore a state prisoner must "present the state courts with the same claim he urges upon the federal courts." Picard v. Connor, 404 U.S. 270, 276 (1971).

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).  In New York, a defendant must exhaust his claims by seeking leave to appeal to the New York Court of Appeals.  See Morgan v. Bennett, 204 F.3d 360, 369 (2d Cir. 2000).

      B.   State Procedural Requirements

A federal court "may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule." Davila v. Davis, 582 U.S. 521, 527 (2017); see also Jimenez v. Walker, 458 F.3d 130, 136 (2d Cir. 2006) ("[F]ederal courts may not review the judgment of a state court that 'rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision.'" (quoting Harris v. Reed, 489 U.S. 255, 260 (1989))).  This principle serves to "ensure that state-court judgments are accorded the finality and respect necessary to

preserve the integrity of legal proceedings within our system of federalism." Martinez v. Ryan, 566 U.S. 1, 9 (2012).

A procedural rule is adequate if it is "firmly established and regularly followed by the state in question." Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999) (internal quotation marks and citation omitted). To be independent, the "state court must actually have relied on the procedural bar as an independent basis for its disposition of the case" by "'clearly and expressly' stat[ing] that its judgment rests on a state procedural bar." Harris, 489 U.S. at 261-63, 265 n.12. Further, a state court's reliance on an independent and adequate procedural bar forecloses habeas review even if the state court also rejected the claim on the merits in the alternative. See, e.g., id., at 264 n.10 (explaining "a state court need not fear reaching the merits of a federal claim in an alternative holding" where it "explicitly invokes a state procedural bar rule as a separate basis for [its] decision" (emphasis in original)); Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 810 n.4 (2d Cir. 2000) ("[W]here a state court says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved."); Nowakowski, 2018 WL 6421056, at *6 (noting "[t]he bar applies even where the state court has also ruled in the alternative on the merits of the federal claim" (internal quotation marks and citation omitted)).

28

Notwithstanding the existence of a procedural bar to a claim under state rules, "a federal court may still review the claim on the merits [1] if the petitioner can demonstrate both cause for the default and resulting prejudice, or [2] if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice." Petronio v. Walsh, 736 F. Supp. 2d 640, 654 (E.D.N.Y. 2010) (citing Coleman v. Thompson, 501 U.S. 722, 749-50 (1991)).  As to the cause and resulting prejudice avenue, "[c]ause may be demonstrated with 'a showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that 'some interference by state officials' made compliance impracticable, . . . [or that] the procedural default is the result of ineffective assistance of counsel.'" Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986) (citations omitted)).[8]  As to prejudice, a petitioner must demonstrate more than "a possibility of prejudice," but rather that the errors below "worked to his actual

---

[8]   Although ineffective assistance of counsel may, in some circumstances, constitute cause for a default, the claim for ineffective assistance "generally must 'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.'" Edwards v. Carpenter, 529 U.S. 446, 452 (2000) (quoting Murray, 477 U.S. at 489); see also Pitre v. Griffin, No. 16-CV-6258, 2016 WL 7442653, at *11 (E.D.N.Y. Dec. 26, 2016) ("[T]he ineffective assistance claim must itself have been exhausted in the state court.").  Here, no such claim has been raised by Petitioner, either in the state courts or in this Petition.

29

and substantial disadvantage." Murray, 477 U.S. at 494 (internal quotation marks and citation omitted; emphasis in original).

"The miscarriage of justice exception is concerned with actual as compared to legal innocence." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (internal quotation marks and citation omitted). A petitioner must demonstrate, by clear and convincing evidence, that he is actually innocent, and must support his claims "with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." Schlup v. Delo, 513 U.S. 298, 324 (1995). Plaintiff does not argue that he is actually innocent, nor does the record support any such argument; therefore, the miscarriage of justice exception is inapplicable. Accordingly, any analysis whether Petitioner has overcome a procedural bar will be limited to the exception for cause and resulting prejudice.

Finally, "[t]he Court is mindful that, as with all pro se pleadings, a habeas petition filed pro se is to be construed liberally." Crowder v. Ercole, No. 09-CV-3401, 2012 WL 5386042, at *2 (E.D.N.Y. Nov. 2, 2012) (citation omitted); see also Alonge v. Chappius, No. 12-CV-542, 2019 WL 1642449, at *6 (E.D.N.Y. Apr. 16, 2019)("[T]he court must interpret petitioner's pleadings as raising the strongest arguments they suggest"). Pro se status, however, "does not exempt a party from compliance with relevant

rules of procedural and substantive law." <u>Triestman v. Fed. Bureau of Prisons</u>, 470 F.3d 471, 477 (2d Cir. 2006) (quoting <u>Traguth v. Zuck</u>, 710 F.2d 90, 95 (2d Cir. 1983)).

DISCUSSION

Petitioner challenges his state court Conviction by raising the identical four grounds he asserted in his state court appeal, <u>i.e.</u>: (1) ineffective assistance of counsel; (2) failure to assign new counsel at Petitioner's request; (3) Petitioner's Conviction was against the weight of the evidence; and (4) Petitioner's sentence is excessive. (<u>See</u> Pet. at 3.) The Court will address each of Petitioner's claims in turn.[9]

## I.   Ground One:  The Ineffective Assistance Claim

Petitioner asserts he is entitled to habeas relief on the ground of ineffective assistance of counsel because defense counsel did not contest the stop-and-search of the Honda and Petitioner's subsequent arrest, although there were grounds to do so. (Pet. at 6; Traverse at 8.) Specifically, Petitioner contends Mr. Fitzgerald was ineffective for failing to request a probable

---

[9] To the extent Petitioner requests an evidentiary hearing (<u>see</u> Traverse at 13), after a thorough review of Petitioner's submissions and the state court record and transcripts, the Court finds in accordance with Rule 8 of the Rules Governing Section 2254 Cases that an evidentiary hearing is not necessary to address Petitioner's claims. <u>See</u> <u>Richardson v. Wolcott</u>, No. 6:20-CV-6178 CJS, 2023 WL 4999832, at *8 (W.D.N.Y. Aug. 4, 2023).

cause hearing under Dunaway v New York, 442 U.S. 200 (1979,[10] and
for failing to move to suppress the evidence that resulted from
the traffic stop.  (Pet. at 6.; Traverse at 4.)  Petitioner argues
that "had [Mr. Fitzgerald] argued that there was no probable cause
to arrest the Petitioner in [a] notice of motion[,] the result of
trial would have been different because there is a possibility
that all evidence as a result of the illegal arrest would have
been suppressed and the indictment dismissed."  (Traverse at 8.)[11]

---

[10]  In Dunaway, the United States Supreme Court held seizures of
suspects are reasonable only if supported by probable cause.  Id.
A hearing held pursuant to Dunaway addresses the propriety of a
suspect's arrest under the Fourth Amendment.  See id.

[11] Respondent contends Petitioner's claim on this ground includes
that defense counsel failed to "investigate or meet" with
Petitioner.  (Resp. Opp at 11-13.)  However, Petitioner raises
this challenge in the second ground of the Petition based upon the
Court's purported failure to provide him new counsel, not in his
first ground for ineffective assistance of counsel.  (See Pet. at
6-7.)  Nonetheless, affording Petitioner every benefit given his
pro se status, to the extent Petitioner seeks relief for
ineffective assistance of counsel based upon his defense counsel's
purported failure to investigate or meet with him, the Court
declines to consider the same as it is unexhausted.  Although
Petitioner raised an ineffective-assistance-of-counsel claim in
state court, Petitioner never claimed it was because his defense
counsel failed to investigate or meet with him.  (See App. Br. at
17-32; App. Div. Decision at 2; see also C.A. Appl.)  Because
Petitioner failed to preserve this issue for appellate review, it
is barred from federal habeas review.  See Strzelecki v.
Cunningham, No. 13-CV-0133, 2019 WL 6050404, *10 (E.D.N.Y. Nov.
15, 2019) (discussing failure to exhaust a claim in state court
bars a habeas petitioner from asserting that claim in federal
court).

Petitioner raised this very claim in his direct appeal. (See App. Br. at 20-27.) The Appellate Division denied Petitioner's appeal on this ground, stating, "there can be no denial of effective assistance of trial counsel arising from counsel's failure to make a motion that has little or no chance of success." (App. Div. Decision at 2.) The Appellate Division found "counsel was not ineffective for failing to move to suppress evidence resulting from a traffic stop where, as here, there was no support in the record for such a motion." (Id. (citing People v. Carver, 27 N.Y.3d 418, 421 (2016)). Therefore, this claim is properly exhausted. However, the Court finds the Appellate Division's denial was not contrary to, or an unreasonable application of, clearly established federal law.

To establish deficient performance, a petitioner must prove "counsel's representation fell below an objective standard of reasonableness." Strickland v. Washington, 466 U.S. 668, 688 (1984). Even if a petitioner can show deficient performance, he must also establish prejudice--that is, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. Further, as a general principle, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. After all, "there are countless ways to provide effective assistance in any given case,"

33

and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way."  Id.

In the context of a habeas petition, in reviewing the totality of the evidence, the habeas court must "use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt."  Burt v. Titlow, 571 U.S. 12, 15 (2013) (quoting Cullen v. Pinholster, 563 U.S. 170, 190 (2011)).  The Supreme Court has instructed "the question is not whether counsel's actions were reasonable . . . [rather, t]he question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."  Harrington v. Richter, 562 U.S. 86, 105 (2011).  Bearing this deferential standard in mind, it is unsurprising that "the great majority of habeas petitions that allege constitutionally ineffective counsel" fail.  Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).

Further framing the issue of ineffective representation to instances involving a suppression motion, "in order to show ineffective assistance of counsel for failure to make a motion to suppress, 'the underlying motion must be shown to be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed.'"  Cruz v. Colvin, No. 17-CV-3757, 2019 WL 3817136, at *16 (E.D.N.Y. Aug.

14, 2019) (quoting <u>United States v. Matos</u>, 905 F.2d 30, 32 (2d Cir. 1990).

       Contrary to Petitioner's assertions, here, the record evidence establishes his defense counsel fulfilled his professional obligation because there is no evidence suggesting there was any potentially meritorious basis upon which such a suppression motion could have been made.  Rather, the record shows the Officers pulled over the Honda, in which Petitioner was a passenger, because it was speeding--traveling at least 60 m.p.h. in a 40-m.p.h.-zone. (<u>See</u> Tr. at 705:7-9; 708:20-709:3; 1338:20-1339:15.)  The Honda came to a stop and, as the Officers approached, they noticed the rear passengers (later identified as Petitioner and Primm) turning around to look back at them and moving about a great deal.  (<u>Id.</u> at 604:23-605:4; 658:22-659:5; 1342:15-19.)  Officer Collins saw Petitioner put his hand in his pocket, which made the Officer uncomfortable approaching the Honda.  (<u>Id.</u> at 1342:20-1343:22.)  Officer Collins noticed Primm was "very uneasy" and continued moving around.  (<u>Id.</u> at 1345:23-1346:5.)  He moved his hands under the seat, under his legs, and in and out of his pockets. (<u>Id.</u> at 1345:7-22.)  Feeling unsafe, Officer Torres asked Primm to exit the Honda, thereafter conducting a quick pat-down of Primm in search for weapons.  (<u>Id.</u> at 661:2-25.)

Testimonial evidence also showed that, during Primm's pat-down, Petitioner: "became visibly nervous"; started "looking around"; and began "frantically moving around," looking over his shoulder to what was happening with Primm and looking back to Officer Collins. (Id. at 1348:2-13.)  Officer Collins testified that when he asked Petitioner to step out of the Honda, as soon as the car door was opened, Petitioner immediately fled.  (Id. at 609: 16-20; 662:2-9; 1348:22-1349:11-14.)

The record demonstrates probable cause existed to stop the Honda as a lawful traffic stop and the Officers acted properly in questioning and further searching the occupants of the Honda. See Jones v. LaValley, No. 11-CV-6178, 2014 WL 1377589, at *22 (S.D.N.Y. Apr. 3, 2014), report and recommendation adopted, 2015 WL 1439406 (S.D.N.Y. Mar. 30, 2015) (finding, based on "a combination of factors," police were justified in pursuit where they were engaged in "an evolving escalating situation").

Even assuming, arguendo, the initial stop of the vehicle was illegal, Petitioner's subsequent flight and shooting of Officer Collins provided probable cause for his arrest.  See United States v. Jenkins, 659 F. App'x 1, 3 (2d Cir. 2016) (finding, even if initial police stop was unlawful, defendant's arrest was not subject to the exclusionary rule due to defendant's subsequent and intervening act of striking an officer); United States v. Bellamy, 592 F. Supp. 2d 308, 323 (E.D.N.Y. 2009) (finding evidence

36

discovered during "defendant's commission of distinct offenses—assault and resisting arrest" were not incident to officer's unlawful stop and therefore were admissible). Under these circumstances, if defense counsel made a motion to suppress, as Petitioner suggests, it would have been unsuccessful. See People v. Nunez, 137 A.D.3d 569, 569 (2016) (motion to suppress properly denied where it was found that, "[e]ven if the police actions in seeking to stop defendant were initially unlawful, any illegality was attenuated by defendant's independent, calculated acts of picking up the pistol he had dropped in his flight, aiming it at one of the officers and firing two shots"); People v. Little, 309 A.D.2d 767, 768 (2003) (motion to suppress properly denied where "defendant's shooting at the officers constituted a calculated, independent criminal act, unrelated to the police activity which preceded it").

Petitioner has failed to establish the existence of any foundation for moving for a Dunaway Hearing. Petitioner has not articulated, and the record does not support, a factual or legal argument which trial counsel failed to assert which would have likely resulted in the suppression of evidence. Thus, Petitioner has not demonstrated trial counsel's performance was ineffective. See Jones, 2014 WL 1377589, at *22; Montgomery v. Wood, 727 F. Supp. 2d 171, 186 (W.D.N.Y. 2010) (denying habeas petition where "[a]part from [petitioner's] own opinion that his arrest was

37

without probable cause and counsel <u>should</u> have moved for a <u>Mapp/Dunaway</u> hearing, Petitioner has not suggested that there were any potentially meritorious bases on which such a suppression motion could have been premised"). Moreover, because there is no "reasonable probability" that, but for counsel's purported error in failing to challenge Petitioner's arrest, the result of the trial would have been different, Petitioner also fails to establish any prejudice under <u>Strickland</u>. <u>See</u> <u>White v. Bellnier</u>, No. 09-CV-744, 2011 WL 6780995, at *9 (E.D.N.Y. Dec. 27, 2011).

Having failed to satisfy either the deficient performance or prejudice prongs of <u>Strickland</u>'s constitutional test for ineffective assistance of counsel, Petitioner's claim seeking habeas relief on this basis fails.

II.  <u>Ground Two:  The Denial of New Counsel Claim</u>

Petitioner asserts he is entitled to habeas relief because the trial court failed to appoint him new counsel at his request, violating his Sixth Amendment right to counsel. (Pet. at 7.) Petitioner contends that, on August 22, 2015, he wrote to the trial court requesting a new attorney and that, on October 26, 2015, he made a similar request in person during the <u>Huntley/Wade</u> hearing. (<u>See</u> <u>id.</u>) Petitioner raised this claim in his direct appeal. (<u>See</u> App. Br. at 33-44.)

The Appellate Division rejected Petitioner's appeal on Ground Two, stating:

> The County Court did not improvidently
> exercise its discretion in denying the
> defendant's application for a substitution of
> counsel, as he failed to make specific factual
> allegations of serious complaints about his
> assigned trial counsel (see People v Porto, 16
> NY3d 93, 99-100; People v Davis, 161 AD3d
> 1000, 1002) and, in any event, the court
> conducted an appropriate inquiry and properly
> determined that the request was not supported
> by good cause (see People v Linares, 2 NY3d
> 507, 510-512; People v Johnson, 116 AD3d 883,
> 883-884).

(App. Div. Decision at 2.)   Therefore, this claim is properly
exhausted.

In opposition, Respondent argues Petitioner's claim on
Ground Two should be denied because denial of new counsel is not
cognizable on habeas review.  (Opp. Br. at 34.)  Respondent further
maintains the state appellate court's determination that the trial
court did not abuse its discretion in denying substitution was
neither contrary to, nor an unreasonable application of clearly
established federal law. (Id.)  The Court agrees with Respondent.

The Sixth Amendment right to counsel includes "the right
of a defendant who does not require appointed counsel to choose
who will represent him." United States v. Gonzalez-Lopez, 548 U.S.
140, 144 (2006).  However, this "right to counsel of choice does
not extend to defendants who require counsel to be appointed for
them." Id. at 151.  In other words, "[t]he [Sixth] Amendment
guarantees defendants in criminal cases the right to adequate
representation, but those who do not have the means to hire their

39

own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624 (1989).

"Aside from this general principle, the Supreme Court has not articulated a standard for deciding a Sixth Amendment claim based on a habeas petitioner's allegation the trial court denied his request for substitute counsel." Ward v. Capra, No. 1:17-CV-0704, 2019 WL 2302351, at *6 (E.D.N.Y. May 30, 2019) (internal quotations omitted). "Hence, [the Court] could not say that the decision of the Appellate Division rejecting petitioner's complaint about his attorney was either contrary to, or an unreasonable application of, established Supreme Court jurisprudence." Cantoni v. Leclair, No. 12-CV-4353, 2015 WL 518226, at *16 (S.D.N.Y. Feb. 9, 2015)(citing 28 U.S.C. § 2254(d)). Therefore, the denial of Petitioner's request for new counsel is not cognizable for purposes of habeas review. See Oshintayo v. Jones, No. 9:19-CV-1249, 2023 WL 3821325, at *9 (N.D.N.Y. Mar. 6, 2023) ("[T]he denial of Petitioner's request for new counsel is not cognizable for purposes of habeas review."), report and recommendation adopted, 2023 WL 3816726 (N.D.N.Y. June 5, 2023); Zuniga v. Lamana, No. 18-CV-5717, 2019 WL 4124416, at *7 (S.D.N.Y. Aug. 30, 2019)(same).

Even if the Court were to consider the merits of Petitioner's claim, the Court would conclude the trial court did not err in refusing to grant new counsel.  Trial courts have a "wide latitude in balancing the right to counsel of choice against the needs of fairness . . . and against the demands of its calendar." Gonzalez-Lopez, 548 U.S. at 152.  In evaluating whether the trial court abused its discretion by refusing to substitute counsel, the court must consider the timeliness of the request, the extent of the court's inquiry, the extent of any breakdown in communication, and whether the defendant's conduct contributed to a breakdown in trust. See United States v. John Doe #1, 272 F.3d 116, 122-23 (2d Cir. 2001).  "Although AEDPA requires this court to apply a standard of review that is more deferential to the state court's conclusions than the abuse-of-discretion standard . . . courts have found the John Doe factors to be instructive in determining whether the state courts' adjudication of [a] Sixth Amendment claim was a reasonable application of an established constitutional right." Bethea v. Walsh, No. 09-CV-5037, 2016 WL 258639, at *33 (E.D.N.Y. Jan. 19, 2016) (internal quotations and citations omitted).

Here, Petitioner first requested new counsel orally on October 26, 2015, during the pre-trial Huntley/Wade hearing. (See

41

Pretrial Tr. at 1-2:24.)[12]  At that point, Mr. Fitzgerald had been appointed and representing Petitioner for at least seven months without complaint by Petitioner.  (Id. at 8:5-22.)  Moreover, the trial court warned Petitioner that his choice to raise this issue just before witnesses were to be called at the hearing was "very, very late and potentially dilatory."  (Id. at 8:23-9:22.)

Petitioner requested substitute counsel because he claimed Mr. Fitzgerald "pushes [him] off like he doesn't care or doesn't have any interest in what [he is] talking about."  (Id. at 7:17-23.)  Thereafter, the trial judge made several inquiries. First, he asked whether Petitioner intended to hire his own attorney, to which Petitioner responded he was "looking for a lawyer."  (Id. at 7:24-8:4.)  Next, the trial judge gave Petitioner the opportunity to describe his concerns about Mr. Fitzgerald's representation.  (Id. at 8:23-9:22.)  Petitioner only reiterated that he felt as though Mr. Fitzgerald dismissed him as irrelevant, pushed him away "like a fly" when he asked for motions to be made, and that Mr. Fitzgerald was not helping Petitioner "in the way [he] want[ed] him to help."  (Id. at 12:3-13:14.)

---

[12] Petitioner claimed to have filed, on or about August 25, 2015, an "18-B" request form seeking to "fire" Mr. Fitzgerald, but the trial court never received such a form.  (Id. at 9:23-11:17.) Further, the trial court pointed out there had been a court appearance on September 14, 2015 -— after the date Petitioner purportedly sent the form and prior to the Huntley/Wade hearing - at which time Petitioner's alleged dissatisfaction was not brought to the Court's attention.  Id.

The trial court then made several findings regarding the adequacy of Mr. Fitzgerald's representation.  It found Mr. Fitzgerald was highly qualified and he had exhibited exemplary work in procuring discovery from the government. (Id. at 8:5-22; 13:15-14:15.)  Mr. Fitzgerald made significant efforts in challenging: the statements Petitioner made to the police at the time of his arrest; the identification of Petitioner; and the presentation to the grand jury.  (Id.)  According to the trial judge, Mr. Fitzgerald had prepared himself diligently for the Huntley/Wade hearing, which, notably, he secured on consent from the District Attorney's Office.  (Id.)  The trial court found Petitioner had not provided any reason Mr. Fitzgerald should be removed.  (Id. at 13:15-14:15.)  Further, Petitioner still had sufficient time before trial to make a formal motion to have counsel relieved, or to hire his own attorney.  (Id. at 15:23-17:2.)  Petitioner never made a formal motion and only raised the issue again the day of trial.  (See Tr. at 18:25-19:6.)[13]

Based upon the above, the trial court appropriately weighed the demands of its calendar and exercised its discretion to deny the substitution-of-counsel requests made on the days of the Huntley/Wade hearing and the beginning of trial.  The Appellate

---

[13]  Petitioner never claimed Mr. Fitzgerald refused to meet with him.  (See Pet. at 7.)  As previously stated, any claim for relief on that basis is unexhausted and will not be considered by this Court. (See supra note 11.)

Division reasonably affirmed the trial court's substitution denials in finding Petitioner "failed to make specific factual allegations of serious complaints about his assigned trial counsel." (See App. Div. Decision at 2.) Accordingly, Petitioner's denial-of-new-counsel claim is without merit.

Further, even if the trial court's denial decision was erroneous, the error was harmless because Mr. Fitzgerald's performance was not ineffective. (See supra DISCUSSION, Part I); see also Peterson v. Bennett, No. 01-CV-0920, 2002 WL 1592600, at *5 (E.D.N.Y. July 18, 2002)("[E]ven if the decision not to substitute counsel was erroneous, the error was harmless because counsel's performance was not ineffective"). Therefore, Petitioner's claim for habeas relief based upon Ground Two fails.

III. Ground Three:  Against the Weight of the Evidence Claim

Petitioner argues he is entitled to habeas relief on the grounds that the jury's verdict is against the weight of the evidence. (Pet. at 9.) Petitioner's claim is not cognizable here as it does not raise a federal question. See McKinnon v. Superintendent, Great Meadow Corr. Facility, 422 F. App'x 69, 75 (2d Cir. 2011). Since Ground Three is based solely upon state law, it is unreviewable in a federal habeas corpus proceeding. See id. ("The argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus."); see also 28 U.S.C. § 2254(a); Estelle, 502

U.S. at 67–68; Butler v. Cunningham, 313 F. App'x 400, 401 (2d Cir. 2009); Smith v. Lee, No. 11-CV-0530, 2014 WL 1343066, at *10 (E.D.N.Y. Mar. 31, 2014) ("It is well settled that a 'weight of the evidence' claim is distinct from an 'insufficiency of the evidence' claim and is a state claim based on N.Y.C.P.L. § 470.15(5) that is not reviewable in a federal habeas proceeding." (citing McKinnon, 422 F. App'x at 75)). For this reason alone, the Court rejects Petitioner's Ground Three claim seeking habeas relief.

Further, to the extent Petitioner's claim can be construed as raising a federal claim that the evidence was insufficient to support the Conviction, the claim still fails because it is both procedurally barred and without merit. In its decision affirming Petitioner's Conviction, the Appellate Division held Petitioner's "contention that the evidence was legally insufficient to establish this guilt is unpreserved for appellate review." (App. Div. Decision at 1) (citing C.P.L. § 470.05[2]; and People v Hawkins, 11 N.Y.3d 484, 492 (2008)). It is of no consequence that the Appellate Division went on to make an alternative finding on the merits; the procedural bar still applies. See Fama, 235 F.3d at 810 n.4 ("Where a state court says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved."); Nowakowski, 2018 WL 6421056, at *6 (stating "[t]he bar applies

45

even where the state court has also ruled in the alternative on the merits of the federal claim" (internal quotation marks and citation omitted)).

Even if the claim were not barred, the Appellate Division's rejection of the claim was not an unreasonable application of controlling Supreme Court law, or factually unreasonable. The applicable federal sufficiency law is well-established:

> [T]he critical inquiry . . . does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.

Jackson v. Virginia, 443 U.S. 307, 318-319(1979) (internal quotations and citations omitted; all emphases omitted); see also Policano v. Herbert, 507 F.3d 111, 115-16 (2d Cir. 2007) ("In a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if

it is found that upon the record evidence adduced at the trial no
rational trier of fact could have found proof of guilt beyond a
reasonable doubt." (quoting Jackson, 443 U.S. at 324)).    A
Petitioner arguing a sufficiency of the evidence claim "bears a
very heavy burden." United States v. Aguilar, 585 F.3d 652, 656
(2d Cir. 2009).  "In considering a petition for writ of habeas
corpus based on insufficient evidence . . . a federal court must
look to state law to determine the elements of the crime" and view
the facts in the light most favorable to the verdict. Green v.
Abrams, 984 F.2d 41, 44-45 (2d Cir. 1993); see Garbutt v. Conway,
668 F.3d 79, 80-81 (2d Cir. 2012) (per curiam).

        The above standards foreclose any possibility of
granting habeas relief on Petitioner's sufficiency claim.
Petitioner claims there is no direct evidence he possessed a
firearm or "fired shots" and no evidence he resisted arrest. (Pet.
at 9.)  But this Court's review begins with the uncategorical
presumption that the jury believed the prosecution witnesses and
drew all reasonable inferences in the prosecution's favor.

    As noted, Petitioner was convicted of one count each of
Attempted Aggravated Murder of a Police Officer, Criminal
Possession of a Weapon in the Second Degree, and Resisting Arrest.
Pursuant to New York State Penal Law, a person is guilty of: (1)
Aggravated Murder when (a) "[w]ith intent to cause the death of
another person, he or she causes the death of such person. . .

47

[who] at the time of the killing in the course of performing his or her official duties", and (b) the intended victim was a police officer (P.L. § 125.26); (2) Criminal Possession of a Weapon in the Second Degree when "such person possesses any loaded firearm" (P.L. § 265.03(3)); and (3) Resisting Arrest "when he intentionally prevents or attempts to prevent a police officer . . . from effecting an authorized arrest of himself or another person" (P.L. § 205.30).

At trial, Officer Collins testified that on the night of the incident, he was on top of Petitioner attempting to handcuff him when he could feel Petitioner's hands "moving around like he was trying to grab for something." (Tr. at 1391:17-1392:25.) That is when Officer Collins "saw a couple of [blue] sparks very close to [his] face," "followed by four loud pops." (Id. at 1358:24-1359:13.) Officer Collins testified he realized Petitioner had a gun and was shooting at him. (Id. at 1359:14-16.) Officer Torres testified that when he arrived on scene, Officer Collins said to him, "Damian, Sheldon Leftenant shot me. His ID is in my pocket." (Id. at 667:9-20.)

The Revolver and its casings were later recovered, placed in a sealed package, and transferred to the Suffolk County crime lab for testing. (Id. at 988:2-990:19; 1053:2-1054:4.) It was found at 13 Mercer Court, right next door to where the shooting occurred and near the shed where Petitioner was found. (Id.) At

trial, evidence was entered demonstrating that, after the Revolver and casings were tested, it was determined the bullets found at the scene were fired from a .38 revolver.  (Id. at 1179:9-13; 1184:14-23.)  Based upon an examination of Officer Collins' clothing, it was further determined the bullets from the Revolver were used to shoot Officer Collins from only "zero to two inches" away.  (Id. at 1218:14-1220:6; 1222:18-1246:15; 1249:10:-22.) Officer Collins' service weapon, however, was never used.  (Id. at 1254:11-17.)[14]

Furthermore, evidence was presented at trial that once Petitioner was discovered in the shed by the K-9 unit, he refused to come out voluntarily.  (Id. at 802:20-806:7.)  Officer Gayer testified he, along with other officers, had to forcibly remove Petitioner from the shed.  (Id. at 806:11-13.)  Officer Gayer also testified Petitioner resisted arrest, refusing to volunteer his hands for handcuffing and refusing to put his hand behind his back. (Id. at 806:21-25.)  Officer Gayer described the event as a "violent struggle" that consisted of officers wrestling Petitioner

---

[14]  To the extent Petitioner's claim includes there was no evidence presented at trial demonstrating he had the intent to kill Officer Collins, the same is unavailing.  (See App. Br. at 47; see also Resp. Opp. at 49-50.)  Intent to kill can be inferred where, as here, a defendant purposely aims his weapon at an officer and fires it multiple times.  See Diggs v. Artus, No. 10-CV-1233, 2013 WL 837271, at *5 (E.D.N.Y. Mar. 5, 2013).

to get his hands from a hidden position into handcuffs.  (Id. at 835:8-836:24.)

Having considered each of the crimes for which Petitioner was convicted and having reviewed the trial record, this Court concludes the Appellate Division's upholding of the Conviction was neither contrary to nor an unreasonable application of clearly established federal law nor based upon an unreasonable determination of the facts.  Accordingly, Petitioner's claim seeking habeas relief based upon Ground Three is rejected.

IV.  Ground Four:  Excessive Sentence Claim

Petitioner contends his original sentence of 56-years-to-life imprisonment, reduced to 40-years-to-life imprisonment by the Appellate Division, is excessive, thereby entitling him to habeas relief.  (See Pet. at 10.)  His argument is unavailing.

It is well settled that an excessive sentence claim, such as Petitioner's, does not present a required federal constitutional issue when the received sentence "is within the range prescribed by state law."  White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992); see also Taylor v. Connelly, 18 F. Supp. 3d 242, 268 (E.D.N.Y. 2014).  In other words, habeas relief on this basis necessarily turns on whether Petitioner's sentence for each crime falls within the prescribed sentencing range under state law.

50

Petitioner was originally sentenced to an aggregate sentence of 56-years-to-life imprisonment and five years of post-release supervision. (Sent'g Tr. at 23:18-24:6; 26:5-14.)   This included consecutive terms of imprisonment of an indeterminate term of 40-years-to-life on Count 1 (Attempted Aggravated Murder of a Police Officer), a determinate term of 15 years followed by five years of post-release supervision on Count 2 (Criminal Possession of a Weapon in the Second Degree), and a definite term of one year on Count 3 (Resisting Arrest). (Id.)

Petitioner's Conviction was affirmed by the Appellate Division, but modified insofar as the terms of imprisonment for Attempted Aggravated Murder of a Police Officer and Criminal Possession of a Weapon in the Second Degree should have been imposed concurrently to each other.  (App. Div. Decision at 2.) Thus, Petitioner's sentence was modified so that his aggregate sentence was reduced to 40-years-to-life imprisonment.  (See id.)

Under New York state law, the maximum sentence permitted for a violation of Attempted Aggravated Murder of a Police Officer, a Class "A-I" Felony, is a term of life imprisonment.  See P.L. §§ 125.26[1][a][i], as modified by P.L. § 110.00; 70.00(2)(a). Additionally, under New York state law, the maximum sentence permitted for a violation of Criminal Possession of a Weapon in the Second Degree, a Class "C" Felony, is a term of imprisonment of 15 years.  See P.L. §§ 265.03[1][b]; 70.00(2)(c).  Finally,

under New York state law, the maximum sentence permitted for a violation of Resisting Arrest, a Class "A" Misdemeanor, is a term of imprisonment of one year.  See P.L. §§ 205.30; 70.15(1).

Petitioner's aggregate sentence of 40-years-to-life imprisonment for Attempted Aggravated Murder of a Police Officer, Criminal Possession of a Weapon in the Second Degree, and Resisting Arrest falls within what is permitted by applicable statute and, hence, does not present a federal constitutional issue.  Therefore, Petitioner's excessive sentence claim, i.e., Ground four, is untenable on habeas review.

<u>CONCLUSION</u>

Accordingly, for all the foregoing reasons, **IT IS HEREBY ORDERED** that Petitioner's Petition (ECF No. 1), is DENIED.  The Clerk of the Court is directed to: dismiss the Petition; close the case; and, mail a copy of this Order to Petitioner.

Further, the Court:

(A)   Declines to issue a certificate of appealability because Petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2); and

(B)   Pursuant to 28 U.S.C. § 1915(a)(3), certifies that any appeal from this Order would not be taken in good faith, and, therefore, in forma pauperis status is denied for the

purpose of any appeal.  See <u>Coppedge v. United States</u>, 369 U.S. 438, 444-45 (1962).


**SO ORDERED** this 5 day of December 2023 at Central Islip, New York.

/s/ JOANNA SEYBERT
Hon. Joanna Seybert
United States District Judge